IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| ALLISON WHITMIRE, ) | Civil Action No. 3:09-03245-JFA-JRM |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL SECURITY ) | |
| ADMINISTRATION, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the Court pursuant to Local Civil Rules 73.02(B)(2)(a) and 83.VII.02, et seq., DSC, concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").

## ADMINISTRATIVE PROCEEDINGS

Plaintiff protectively applied for DIB and SSI on August 31, 2004, with an alleged onset of disability of April 1, 2003. The applications were denied initially, on reconsideration and, after hearing, by Administrative Law Judge (ALJ) decision dated April 26, 2007. On May 9, 2007, Plaintiff requested that the Appeals Council review the ALJ's decision. By order dated October 26, 2007, the Appeals Council remanded Plaintiff's claim for further proceedings.

Plaintiff appeared and testified at a supplemental hearing held on April 4, 2008, at which a vocational expert (VE) also appeared and testified. On July 22, 2008, the ALJ issued a decision finding Plaintiff was not disabled because, based on Plaintiff's residual functional capacity, her

vocational factors, and the testimony of the VE, she can make an adjustment to other work. See 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).

Plaintiff was twenty-four years old at the time of the ALJ's decision. The ALJ found that she has a limited education with questionable past relevant work as a restaurant server and hostess. (Tr. 25). Plaintiff initially alleged disability due to bipolar disorder and attention deficit hyperactivity disorder. (Tr. 193).

The ALJ found (Tr. 17, 18, 22, 24, 25-26):

1. The claimant met the insured status requirements of the Social Security Act through June 30, 2005.

2. The claimant has not engaged in substantial gainful activity since April 1, 2003, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. I find that the claimant has the following severe combination of impairments: major depressive disorder in partial remission, social anxiety disorder, probable attention deficit disorder, and borderline intelligence (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to simple unskilled work which requires only infrequent contact with the public (i.e., less than 10% of the time).

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on September 5, 1983 and was 19 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

> 8. The claimant has a limited education in special education and is able to communicate in English (20 CFR 404.1564 and 416.964).
>
> 9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
>
> 10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).
>
> 11. The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2003, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

On October 20, 2009, the Appeals Council denied Plaintiff's request for review (Tr. 7), thereby making the ALJ's determination the Commissioner's final decision for purposes of judicial review. See 20 C.F.R. §§ 404.981, 416.1481. Plaintiff then filed this action on December 18, 2009.

## SCOPE OF REVIEW

The Social Security Act (the "Act") provides that DIB[1] shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in the Act as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than" twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).[2]

---

[1] Eligibility requirements for SSI differ, see 42 U.S.C. § 1382, but are not an issue in the case sub judice.

[2] The regulations applying these sections are contained in different parts of Title 20 of the
(continued...)

3

In evaluating whether a claimant is entitled to disability benefits, the ALJ must follow the five-step sequential evaluation set forth in the Social Security regulations. See 20 C.F.R. § 404.1520.[3] The ALJ must consider whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to her past work, and (5) if not, whether the claimant retains the capacity to perform specific jobs that exist in significant numbers in the national economy. See id.

The scope of judicial review by the federal courts in disability cases is narrowly tailored. Thus, the only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). Consequently, the Act precludes a de novo review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). Substantial evidence is:

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

---

[2](...continued)
Code of Federal Regulations (C.F.R.). Part 404 applies to federal old-age, survivors, and disability insurance, and part 416 applies to supplemental security income for the aged, blind, and disabled. Since the relevant portions of the two sets of regulations are identical, the citations in this report will be limited to those found in part 404.

[3]All of this Court's regulatory references are to the 2008 version of the C.F.R.

4

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).  It must do more, however, than merely create a suspicion that the fact to be established exists.  Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that this conclusion is rational. Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

## DISCUSSION

In her brief before the court, Plaintiff alleges that the ALJ erred in finding that she did not meet "Listing" 12.05C, and as to the weight he assigned to medical source opinions.  The Commissioner contends that the ALJ's decision is supported by substantial evidence and free of legal error.

**A.  The Listings**

Plaintiff complains that the ALJ failed to properly evaluate whether she met 12.05 of the "Listing of Impairments."  See 20 C.F.R. part 404, subpart P, appendix 1[4] [hereinafter The Listings]. The Commissioner compares the symptoms, signs, and laboratory findings of an impairment, as shown in the medical evidence, with the medical criteria for a listed impairment.  "If a severe impairment is of the degree set forth in a Listing, and such impairment meets the twelve-month durational requirement, . . . then [the claimant] 'is conclusively presumed to be disabled and entitled to benefits.'"  Warren v. Shalala, 29 F.3d 1287, 1290 (8th Cir. 1994) (quoting Bowen v. City of New

---

[4] The Listing of Impairments is applicable to SSI claims pursuant to 20 C.F.R. § 416.911.

York, 476 U.S. 467, 470-71 (1986)); see also 20 C.F.R. § 404.1520(a). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). It is not enough that the impairment have the diagnosis of a listed impairment; the claimant must also have the findings shown in the Listing of that impairment. 20 C.F.R. § 404.1525(d); see Bowen v. Yuckert, 482 U.S. 137, 146 & n.5 (1987) (noting the claimant's burden to show that his impairment is presumptively disabling at step 3 of the sequential evaluation and to furnish medical evidence regarding his condition).

In Plaintiff's case, the ALJ found that her severe impairments did not meet or equal *any* Listing, particularly 12.02, 12.04, 12.05 and 12.06. (Tr. 22). As to mental retardation, the Listings provide:

> Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing. . . .

The Listings, supra, 12.00A. The Listings reiterate that they "are so constructed that an individual with an impairment(s) that meets or is equivalent in severity to the criteria of a listing could not reasonably be expected to do any gainful activity." Id.

The "diagnostic description" defines mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." Id., 12.05. To meet Listing 12.05C, the claimant must additionally show a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Id., 12.05C.

Plaintiff complains that the ALJ improperly rejected her IQ (intelligence quotient) score, but the ALJ acted within his purview:

> While an IQ test is helpful in determining whether an applicant has a mental impairment, it is not the only evidence that may be examined. Other information which indicates an individual's ability to function can be used to discredit the results of the IQ test. Holland v. Apfel, 153 F.3d 620, 622 (8th Cir. 1998). We have held that an ALJ may reject IQ scores if they are inconsistent with the rest of the record. Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998). Test results should be examined to assess consistency with daily activities. Id.

Johnson v. Barnhart, 390 F.3d 1067, 1071 (8th Cir. 2004); see also Lax v. Astrue, 489 F.3d 1080, 1087 (10th Cir. 2007) (holding that "it was proper for the ALJ to consider other evidence in the record when determining whether Lax's IQ scores were valid"); Adkins v. Astrue, 226 F. App'x 600, 605 (7th Cir. 2007) ("Although low IQ scores are indicative of retardation, other factors, such as the claimant's life activities and employment history, must be considered and weighed and properly play into the ALJ's analysis."); Markle v. Barnhart, 324 F.3d 182, 186 (3d Cir. 2003) ("[T]he Commissioner is not required to accept a claimant's IQ scores and may reject scores that are inconsistent with the record.").

In his review of the evidence, the ALJ noted the report from Joseph Hammond, Ph.D. (See Tr. 18-19 (citing Tr. 297-300)). Dr. Hammond noted that Plaintiff appeared to be capable of understanding, remembering, and executing simple instructions. Plaintiff reported to Dr. Hammond participation in a limited range of activities of daily living, but with a high degree of independence. She presented as pleasant and cooperative, and not as emotionally dysphoric as she described. Plaintiff did not exhibit psychomotor agitation or retardation; she was not tearful; and she did not appear to be tense or hyperaroused.

The ALJ further referred to Plaintiff's school records, which demonstrated that Plaintiff had the ability to read, write, communicate her thoughts verbally, and perform some mathematics. (Tr. 21). The ALJ observed that Plaintiff was "fairly articulate" during her testimony at both hearings. (Id.). See Miles v. Barnhart, 374 F.3d 694, 699 (8th Cir. 2004) ("[T]he ALJ did not err in relying, in part, on his observation of Miles at the hearing in discounting the IQ score.").

The ALJ cited Plaintiff's testimony that she prepares her son's breakfast every morning, goes shopping twice a week, and had recently been pursuing her general equivalency degree before she got pregnant. (Tr. 21). The ALJ concluded that Plaintiff's difficulty in adjusting to adult responsibilities was due primarily to her "chaotic childhood," but that she is able to care for her child and "has the ability to present herself in a composed fashion." (Tr. 22). The ALJ noted Plaintiff's psychiatric treatment records which revealed that, when she is compliant with medication and therapy, "she can function quite well." (Id.). The ALJ's description, which is supported by the record, does not comport with the Listing's definition of someone with "*significantly subaverage* general intellectual functioning." The Listings, supra, 12.05 (emphasis added).

Plaintiff also objects to the ALJ's finding that she failed to establish "deficits in adaptive functioning initially manifested during the developmental period."[5] (Tr. 23). Plaintiff relies on a 1999 Cognitive and Educational Evaluation included in her school records. (See Tr. 97-103). Although the ALJ acknowledged that Plaintiff "had some difficulties in school," he additionally noted the Evaluation's statement that Plaintiff's percentile rank and standard score of "Broad

---

[5] Contrary to Plaintiff's argument, the ALJ did not find "there was no evidence of *low IQ scores* during the developmental period." (Pl.'s Br. 28 (emphasis added)).

8

Cognitive Ability"[6] "fall in the low average range of ability for her age." (Tr. 97, cited at Tr. 24). Cf. Turner v. Comm'r of Soc. Sec., 381 F. App'x 488, 492 (6th Cir. 2010) (holding, "A claimant must produce evidence beyond his present IQ scores to show that he exhibited deficits during his developmental period.").

Case law indicates that "deficits in adaptive functioning" means more than simply "low average." As explained by the Court in Mendez v. Barnhart, 439 F.3d 360 (7th Cir. 2006), with regard to Listing 12.05C:

> Although an IQ in [the 60 to 70] range seems very low, there are several types of job that a person with such a low IQ can perform, such as cleaning and janitorial jobs. Anderson v. Sullivan, 925 F.2d 220, 223 (7th Cir. 1991); U.S. Dept. of Labor, Bureau of Labor Statistics, Occupational Outlook Handbook: 2004-05 Edition 6, 373 (Bulletin 2570, March 2004). . . . Roughly 95 percent of the population has an IQ between 70 and 130, which places Mendez toward the top of the bottom 2.5 percent or so, Joseph D. Matarazzo, Wechler's Measurement and Appraisal of Adult Intelligence 124-25, 128 (5th ed. 1972), but does not indicate how far her intelligence falls short of that of the average person. Id. at 126. Generally, an IQ of 70 is considered just at the borderline of mental retardation. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM-IV-TR) 41-43 (4th ed. 2000); Stedman's Medical Dictionary 1557 (27th ed. 2000); Medline Plus Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/ency/article/001912.htm, visited Jan. 30, 2006. . . .

Id. at 361. Plaintiff has failed to establish that the ALJ committed an error of law in finding she did not meet Listing 12.05C.

---

[6]The Cognitive and Educational Evaluation defines "Broad Cognitive Ability" as "a measure of overall functioning based on an average of seven different cognitive abilities." (Tr. 97).

9

**B. Medical Source Opinions**

Plaintiff contends that the ALJ improperly evaluated the medical opinions of record. The regulations require that all medical opinions in a case be considered. 20 C.F.R. § 404.1527(b). All "acceptable medical source"[7] opinions, regardless of its giver, are evaluated

> pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist.

Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005) (footnote omitted) (citing 20 C.F.R. § 404.1527 (2005)).

Plaintiff first addresses the report of Robert Moss, Ph.D. The ALJ explained that, after the Appeals Council remand, Dr. Moss conducted a consultative psychological evaluation of Plaintiff. (Tr. 19; see also Tr. 304-07). Dr. Moss diagnosed Plaintiff with major depressive disorder in partial remission, social anxiety disorder, and probable attention deficit disorder. On Axis II,[8] Dr. Moss listed "Borderline intelligence," and *not* mental retardation. (Tr. 307). The ALJ noted the doctor's assessment that Plaintiff's IQ scores were "an 'acute (sic) indication of her current level of functioning.'" (Tr. 19 (quoting Tr. 306) (alteration ALJ's)).

Although Plaintiff urges Dr. Moss' IQ findings as support for her Listings argument, it is notable that Dr. Moss did not diagnose her with mental retardation but, rather, with borderline

---

[7]See 20 C.F.R. § 404.1502.

[8]The term "axis" refers to the "multiaxial system," where each of five axes "refers to a different domain of information that may help the clinician plan treatment and predict outcome." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 27 (4th ed., text rev. 2000). Axis II lists personality disorders and mental retardation.

10

intelligence. There is no presumptive disability attached to borderline intelligence. Cf. Mendez, 439 F.3d at 361.

Further, according to the text of the American Psychiatric Association, "[T]here is a measurement error of approximately 5 points in assessing IQ[.]" Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed., text rev. 2000) [hereinafter DSM-IV-TR]. Thus, the DSM-IV-TR warns that "Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no *significant* deficits or impairments in adaptive functioning. . . . Impairment in adaptive functioning, rather than a low IQ, are usually the presenting symptoms in individuals with Mental Retardation." Id. at 42. Accordingly, although the ALJ found that Plaintiff's 69 IQ score did not qualify her to meet Listing 12.05C, neither does Dr. Moss' evaluation.

Plaintiff next cites to the opinion of C. David Tollison, Ph.D., who conducted a "Diagnostic Evaluation" of Plaintiff after her reconsideration decision. (See Tr. 251). In his first decision, the ALJ discussed Dr. Tollison's recitation that Plaintiff did laundry, prepared meals, regularly attended church, visited with her sister, and cared for her personal needs. (Tr. 48). The doctor's mental status examination revealed that Plaintiff had disorganized thoughts and problems staying on task. Plaintiff, however, also had an upper borderline to lower average range of intelligence with full sphere orientation, intact thought processes, and intact memory function. Additionally, Plaintiff exhibited no hallucinations, delusions, or psychotic symptoms.

The ALJ noted Dr. Tollison's diagnoses of bipolar disorder and probable attention deficit hyperactivity disorder, and the doctor's opinion that Plaintiff was unable to maintain concentration for either task completion or as required for work settings. The ALJ rejected these opinions, however, because they were from "a one time examiner who uses the same language over and over

11

again to describe incapacity but whose opinions are not supported by his own mental status findings and are inconsistent with the longitudinal record and other assessment of greater functioning and ability." (Id.). In response to Plaintiff's request for review (see Tr. 70), the Appeals Council remanded this decision because the ALJ appeared to assess Dr. Tollison's opinion "in light of other statements . . . that are not in the record." (Tr. 56).

In the decision challenged herein, the ALJ described Dr. Tollison's assessments as "significant and disabling psychological impairments." (Tr. 19). In evaluating the doctor's opinions, the ALJ noted first that he "is not a treating physician, and his assessment is not due the evidentiary weight of a treating physician." (Tr. 25). See Johnson, 434 F.3d at 654 ("Courts often accord 'greater weight to the testimony of a treating physician' because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant.") (quoting Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001)). Plaintiff objects that this is no reason to reject Dr. Tollison's assessment, but concedes that it is a factor in the weighing of opinions. See 20 C.F.R. 404.1527(d),(2) (listing "Treatment relationship" as one of the factors considered in weighing a medical opinion); Johnson, 434 F.3d at 654 (same).

Plaintiff next complains that the ALJ did not explain his statement that Dr. Moss' assessment[9] did not support Dr. Tollison's findings. (Tr. 25). See Johnson, 434 F.3d at 657 (affirming weight awarded by ALJ when the doctor's opinion was "consistent with the other medical opinions"). There is, however, no need for such explanation. See, e.g., Scott v. Barnhart, 297 F.3d 589, 595 (7th Cir. 2002) (the ALJ need only articulate the evidence sufficiently to enable the court to trace his path of

---

[9]The ALJ did not use Dr. Hammond's opinion to contrast with Dr. Tollison's, as the ALJ considered Dr. Moss "to be the moderate voice of reason in this case." (Tr. 25).

12

reasoning); see also Inova Alexandria Hosp. v. Shalala, 244 F.3d 342, 350 (4th Cir. 2001) (quoting Bowman Transp. v. Arkansas-Best Freight Sys., 419 U.S. 281, 286 (1974)) (promising affirmance of "'a decision of less than ideal clarity if the agency's path may reasonably be discerned'"). The ALJ recounted Dr. Tollison's conclusion that Plaintiff was "highly unlikely" to be able to sustain the concentration necessary for task completion (Tr. 18), and Dr. Moss' opinion that Plaintiff would have only "moderate impairment" in concentration (Tr. 19). Dr. Moss added that Plaintiff's memory and concentration difficulties would "become significant *at times with increased anxiety*" (id. (emphasis added)), but Dr. Tollison predicted that Plaintiff's response to apparently normal "work pressures, stresses, and demand situations" would "result in marked and immediate deterioration in psychological functioning" (Tr. 18). Further, Dr. Tollison opined that Plaintiff had "marked" difficulties with activities of daily living (id.), but Dr. Moss felt that Plaintiff had only a "mild" impairment in independent functioning (Tr. 19). Unlike Dr. Moss, Dr. Tollison clearly paints a picture of someone who is unable to work, as confirmed by the testimony of the VE at both hearings. (See Tr. 385, 408).

The ALJ further explained that Plaintiff's psychiatric treatment notes (which Plaintiff admits the ALJ summarized "in some detail" (Pl.'s Br. 33)), did not support Dr. Tollison's assessment. (Tr. 25). See Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996) ("[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."). The ALJ stated that the treatment records show that Plaintiff can present "in a histrionic fashion," yet can function well when compliant with her medication and therapy; that Plaintiff had "difficult family dynamics"; and that Plaintiff "has had the expected stresses involved in parenting." (Tr. 22). In direct contrast, however, to Dr. Tollison's opinion, the

13

records indicate that Plaintiff occasionally has concentration difficulties, but "can also persist when necessary." (Tr. 23). Overall, the ALJ provided substantial evidence to support his weighting of the medical opinions.

## **CONCLUSION**

Despite Plaintiff's claims, she fails to show that the Commissioner's decision was not based on substantial evidence. This Court may not reverse a decision simply because a plaintiff has produced some evidence which might contradict the Commissioner's decision or because, if the decision was considered de novo, a different result might be reached.

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence. Richardson v. Perales, supra. Even where a plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. Blalock v. Richardson, supra. The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion. Shively v. Heckler, supra. It is, therefore,

RECOMMENDED that the Commissioner's decision be **affirmed**.

Joseph R. McCrorey
United States Magistrate Judge

February 11, 2011
Columbia, South Carolina

14